UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
BOSTON TOMATO & PACKAGING,     )
LLC, LISITANO PRODUCE, INC.,   )
JOHN CERASUOLO CO., INC.,      )
FORLIZZI AND BIMBER, INC.,     )
GREGG DZIAMA INC., and STATE   )
GARDEN, INC.,                  )
                               )
        Plaintiffs,             )    CIVIL ACTION NO.
                               )    12-11865-DPW
GARDEN FRESH SALAD CO., INC.,  )
COOSEMANS BOSTON INC., HOP     )
HING PRODUCES, INC., GRANT     )
STANTON PRODUCE CO., INC.,     )
MUTUAL PRODUCE CORPORATION,    )
TRAVERS FRUIT COMPANY INC.,    )
M. CUTONE MUSHROOM COMPANY     )
INC., B.C. PRODUCE, INC.,      )
ARROW FARMS, INC., DISILVA     )
FRUIT DISTRIBUTORS, INC.,      )
INFINITE HERBS, LLC, and       )
MATARAZZO BROTHERS CO., INC.,  )
                               )
        Intervening Plaintiffs, )
                               )
v.                             )
                               )
BOSTONIA PRODUCE, INC.,        )
STEVEN SPLAGOUNIAS, and        )
NIKITAS SPLAGOUNIAS,           )
                               )
        Defendants,             )
                               )
------------------------------
                               )
                               )
DEMETRIOS VARDAKOSTAS,         )
                               )
        Intervenor.             )
```

MEMORANDUM AND ORDER
April 7, 2015

This action arises from the failure of produce dealer Bostonia Produce, Inc. ("Bostonia"), to pay for wholesale

quantities of produce purchased from the plaintiff produce sellers. In October 2012, plaintiffs brought suit under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e, against Bostonia and its officers Steven Splagounias and Nikitas Splagounias. The PACA requires produce dealers who purchase produce on credit to hold the produce and its proceeds in trust for the unpaid seller. 7 U.S.C. § 499e(c)(2). On February 4, 2013, I entered judgment against defendants in the amount of $1,022,061.84 for outstanding payments on produce purchased from the plaintiffs, plus $55,750.30 in pre- and post-judgment interest and $87,826.40 in costs and attorneys' fees.

In an effort to recover funds sufficient to satisfy that judgment, plaintiffs moved for disgorgement of $120,000 paid in July 2011 by Bostonia to intervenor Demetrios Vardakostas, a former part-owner, officer and employee of Bostonia. I treated plaintiffs' motion for disgorgement as a motion for summary judgment and denied the motion as such on April 8, 2013. *Boston Tomato & Packaging, LLC* v. *Bostonia Produce, Inc.*, No. 12-11865-DPW, 2013 WL 1793858 (D. Mass. April 8, 2013). Although I concluded Vardakostas could not establish the $120,000 was anything other than PACA trust assets, I found a genuine dispute remained as to whether Vardakostas was shielded from disgorgement as a bona fide purchaser for value. *Id*. at *5. Because the transfer of trust assets to Vardakostas was plainly "for value,"

the only issue remaining was whether Vardakostas had actual or constructive knowledge that he received payment from Bostonia in breach of the PACA trust. *Id.*

I held an evidentiary hearing on the issue, and the parties thereafter submitted supplementary affidavits and memoranda, although none provided or even ordered a transcript. In their supplementary materials, plaintiffs requested disgorgement of an additional $40,000, based on Vardakostas's alleged participation in diverting to Steven Splagounias the proceeds from the sale of Bostonia trucks to Atlas Produce and Provisions ("Atlas"), an entity of which Vardakostas is the sole member and proprietor.

Based on the evidentiary record developed, I now conclude that plaintiffs are not entitled to disgorgement of the $120,000 payment from Bostonia to Vardakostas. I will, however, require Vardakostas to show cause, if any there be, why he should not pay the judgment creditors $40,000 as a result of his apparent participation in diversion of trust assets, that is, the proceeds from the sale to Atlas of trucks previously owned by Bostonia.

## I. BACKGROUND

**A. General Background**

The basic facts underlying the issue of disgorgement were developed in the summary judgment record and are not in dispute.

From January 1980 through July 2010, Vardakostas was a 50% owner of Bostonia, where he also served as a Director, Secretary

-2-

and employee.  In April 2010, Vardakostas agreed to sell his
shares to Steven Splagounias and Bostonia for $1.6 million.  As
part of the stock sale, Bostonia executed a note promising to pay
Vardakostas $400,000 plus a fixed 5% interest rate in four
installments over four years.  Certain Bostonia property served
as collateral.  The note was also guaranteed by Steven, Nikitas,
Konstantinos and Helen Splagounias, as memorialized in an
indemnification agreement dated July 9, 2010.  As a condition of
the sale, Vardakostas agreed not to compete with Bostonia for two
years from the sale, although the agreement allowed him to
communicate with Bostonia customers regarding personal matters.

On or about July 9, 2011, Bostonia timely made the first
payment due under the note in the amount of $120,000.  Bostonia
has not made any other payments to Vardakostas.

From July 2010, following his employment with Bostonia,
until July 2011, Vardakostas ran a refrigeration company called
Olympic Refrigeration, Inc.  In the fall of 2012, Vardakostas
returned to the produce business by founding Atlas.

**B.   Evidentiary Hearing**

At the evidentiary hearing regarding disgorgement,
Vardakostas testified to his understanding that Bostonia was in
good financial health in 2010, and that he had no reason to
believe Bostonia's financial situation was substantially
different in 2011.  He also testified that Bostonia held assets

that included four truck bays valued at about $1.6 million, 19 trucks worth about $900,000, inventory worth about $800,000, a variety of other equipment, and accounts receivable of about $1.3 million. Vardakostas said that Bostonia was current on its bills in 2010 and that he understood Bostonia to have assets more than sufficient to pay its creditors.

According to Vardakostas, he did not learn of Bostonia's financial troubles until late in 2011 or early in 2012 when he spoke with Bostonia's accountant and began to hear rumors about Bostonia failing to pay suppliers. He attributed his prior lack of knowledge to his inability to communicate with produce suppliers due to his non-competition agreement and his falling out with the Splagounias family. Vardakostas testified that he had no contact with the Splagounias family after July 2010 other than seeing Steven Splagounias at a wedding within a year of the stock sale.

Representatives of three of Bostonia's PACA creditors – plaintiffs Forlizzi and Bimber, Inc. ("Forlizzi"), Gregg Dziama, Inc. ("Dziama"), and Lisitano Produce, Inc. ("Lisitano") – also testified at the hearing. These witnesses provided testimony and documentary evidence, uncontested by Vardakostas, establishing that in July 2011 Bostonia owed an amount on the order of $400,000 to Forlizzi, Dziama, and Lisitano. The suppliers' records also showed that Bostonia regularly made late payments on

invoices.  Lisitano records, for example, showed that although Bostonia had 21-day payment terms, it frequently made payments a full month or two after invoice, if not more.

The records also showed, however, that all invoices from Dziama through June 2011 were paid by Bostonia by mid-August. Similarly, all invoices from Lisitano through June 2011 were paid by Bostonia by the end of September.  Forlizzi records did not indicate whether Bostonia similarly paid summer 2011 invoices sometime later that year.

**C. Supplementary Materials**

Earlier in this litigation, before the disgorgement proceedings, plaintiffs expressed concern about Bostonia trucks that had been sold on October 4, 2012, the day before plaintiffs initiated this action and I imposed a temporary restraining order freezing Bostonia's assets.  The bills of sale for three trucks bore illegible signatures and otherwise failed to identify the buyer.  Two trucks were sold for $19,000 and a third for $2,000, for a total of $40,000.  Bostonia's bank records, however, show no deposit corresponding to the $40,000 paid for the trucks.

Shortly after the evidentiary hearing regarding disgorgement, plaintiffs received registration documentation from the Massachusetts Registry of Motor Vehicles indicating that Bostonia had sold the three trucks to Atlas.  The title transfer documents were signed by Vardakostas and Steven Splagounias.

Plaintiffs brought these matters to my attention by supplemental affirmation. In supplemental submissions I permitted the parties to make, plaintiffs requested that I order Vardakostas to pay the PACA judgment creditors $40,000 based on his alleged participation in diverting trust assets. Vardakostas has not responded to the substance of that request.

## II. ANALYSIS

### A. Disgorgement of $120,000

#### 1. Legal Framework

The PACA seeks to protect produce sellers against the vulnerabilities inherent in financing arrangements frequently used in the trade of perishable agricultural commodities, by which produce sellers become unsecured creditors to buyers whose creditworthiness cannot be verified in a timely manner. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995); *In re Kornblum & Co.*, 81 F.3d 280, 283 (2d Cir. 1996); *see generally* H.R. Rep. No. 98-543, at 3 (1983), *reprinted* in 1984 U.S.C.C.A.N. 405, 406-07. To that end, the statute requires produce dealers who purchase produce on credit to hold the produce and its proceeds in trust for the unpaid seller. 7 U.S.C. § 499e(c)(2). A PACA trustee, however, "does not commit a *per se* breach of fiduciary duty when trust funds are used to conduct a commercial transaction with a non-PACA party." *Coosemans Specialties, Inc.* v. *Gargiulo*, 485 F.3d 701, 706 (2d

Cir. 2007). Under Department of Agriculture regulations, a breach of trust occurs when the PACA trustee fails "to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities" – by, for example, dissipating trust assets. 7 C.F.R. § 46.46(d)(1) (2011). Through the trust, "the sellers of [perishable] commodities maintain a right to recover against the purchasers superior to all creditors, including secured creditors." *Endico Potatoes*, 67 F.3d at 1067.

Nevertheless, a third-party transferee of trust property is not liable to PACA trust beneficiaries if he is a bona fide purchaser for value. *See* Restatement (Second) of Trusts § 284. A third-party transferee thus may retain trust property, even if obtained as a result of a breach of trust, if the transferee: "(i) gave value for the trust property *and* (ii) had no actual or constructive notice of the breach of trust." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir. 1998) (emphasis in original); Restatement (Second) of Trusts § 284(1) (1959).

Under the *Restatement (Second) of Trusts*, a transferee "should have known" of a breach of trust:

> when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would

give him knowledge or reason to know that the trustee is
committing a breach of trust.

Restatement (Second) of Trusts § 297 cmt. a (1959). *Accord Gargiulo* v. *G.M. Sales, Inc.*, 131 F.3d 995, 1000 (11th Cir. 1997) ("In the PACA context, once a lender has knowledge that the borrower/trustee was experiencing financial difficulties, or was failing to pay his or her suppliers, the lender has a duty of inquiry. . . . If such an inquiry would have revealed the breach of the trust, then the person 'should have known' of the breach."). The more recent *Restatement (Third) of Trusts* continues to disqualify bona fide purchaser status based on constructive knowledge that the trustee is acting improperly, *Restatement (Third) of Trusts* § 108(1) (2012), but eliminates the transferee's duty of inquiry, *id.* § 108(3).

2. <u>Analysis</u>

I previously concluded that the July 2011 payment on the promissory note received by Vardakostas as compensation for his shares and in the "ordinary course of business," *Consumers Produce Co.* v. *Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1380 (3d Cir. 1994), was a transfer "for value." *See Boston Tomato*, 2013 WL 1793858, at *5. There is no basis to revise that conclusion.

The crux of the remaining dispute, then, is whether Vardakostas had actual or constructive knowledge that he received

payment from Bostonia in breach of the PACA trust.  *Albee Tomato*, 155 F.3d at 616; *Consumers Produce*, 16 F.3d at 1380-82.  I conclude that Vardakostas did not have such knowledge under either *Restatement* standard and therefore qualifies as a bona fide purchaser for value.  In reaching this determination, I make the following findings of fact and conclusions of law.

I did not find Vardakostas's testimony at the evidentiary hearing entirely credible.  Vardakostas suggested that he was completely unaware of developments in Bostonia's financial situation after 2010 by virtue of his falling out with the Splagounias family and his agreement not to communicate with Bostonia customers.  More specifically, Vardakostas testified that he had little to no contact with the Splagounias family after July 2010.  That testimony is belied, however, by the evidence that Vardakostas, through Atlas, purchased trucks from Steven Splagounias, through Bostonia, in October 2012.  The fact of – and inattention to formalities in – that sale evidences that Vardakostas maintained some type of relationship with the Splagounias family.  I find and conclude that Vardakostas had at least a general knowledge about Bostonia's financial situation in 2011, despite having formally separated from the company the year prior.

Nevertheless, I do not find that Vardakostas had sufficient specific knowledge of Bostonia's financial situation to be found

to have a cognizable awareness of any breach.  To be sure, there was outstanding debt to PACA creditors as of July 2011. Vardakostas does not dispute that this amount was on the order of $400,000 just to Forlizzi, Dziama, and Lisitano.  Neither does Vardakostas dispute that Bostonia had made a habit of late payment since at least 2009.

Lisitano and Dziama, however, were paid in full for all June 2011 invoices.  Putting aside whether Vardakostas may be charged with knowledge of any such breach, this suggests that Bostonia had sufficient assets to pay its debt and may not yet have even been in breach of the trust in July 2011.  *Cf. Consumers Produce*, 16 F.3d at 1379 n.2.

These suppliers were, of course, paid only on the habitually slow schedule established by Bostonia over the years.  Generally, delay is classic evidence from which a third-party transferee may be charged with notice of breach of trust.  *Cf. Consumers Produce*, 16 F.3d at 1384.  Here, however, the habit of slow payment by Bostonia over several years of dealing with the same produce suppliers weighs in Vardakostas's favor during the relevant time period.  Bostonia paid in full its April and May invoices from Lisitano and Dziama in July 2011, for example.  It was business as usual for Bostonia to pay its suppliers a month or two after invoicing, and thus not something

that should have put Vardakostas on notice that Bostonia may have been operating in breach of the PACA trust.

Whether invoices from other creditors like Forlizzi were being paid consistent with past practice in July 2011, or whether new invoices from July 2011 were actually satisfied, is less clear from the record. The steadily increasing debt to Forlizzi at least suggests that Bostonia was a company in decline. But I credit Vardakostas's testimony that he understood Bostonia to have freely available assets sufficient to pay its suppliers.

I recognize there are shortcomings in Vardakostas's testimony. His estimate of the value of bays, trucks, inventory, other equipment, and accounts receivable at around $4.5 million is plainly overstated. For example, Vardakostas placed the value of the trucks at nearly $50,000 per truck, when he purchased three trucks for just $40,000. Additionally, at least some of the assets taken into account by Vardakostas were not "freely available." See *Coosemans Specialties*, 485 F.3d at 707 ("uncollected accounts receivable" are not freely available). But unlike uncollected accounts receivable, the availability of which is contingent on payment by a third party, most equipment and inventory may be liquidated with greater or lesser ease by the PACA trustee. Indeed, PACA itself contemplates that "inventories of food or other products derived from perishable agricultural commodities" constitute trust assets which may be

-11-

liquidated to satisfy PACA creditors. 7 U.S.C. § 499e(c)(2). It was thus proper for Vardakostas to consider the value of these items in assessing Bostonia's financial health and compliance with its PACA obligations.

Additionally, according to plaintiffs' most recent report, over $750,000 of the present judgment for plaintiffs has been satisfied. That, of course, does not excuse the obligation also to come up with the nearly $400,000 that remains outstanding. But the extent of satisfaction of the current judgment is some evidence of the liquidity of Bostonia's assets. Considering the apparent trajectory of Bostonia's financial condition, I infer that Bostonia had even more liquid assets and/or less debt in July 2011, making it reasonable for Vardakostas to have believed that Bostonia's assets were sufficient to cover outstanding liabilities to PACA creditors at that time.

Plaintiffs suggest that Vardakostas must have known Bostonia was in poor financial health because he received personal guarantees from the Splagounias family for the $400,000 promissory note. But, given his long history in the produce industry, Vardakostas surely knew that his interest even as a secured creditor would be subordinate to PACA creditors. *See Endico Potatoes*, 67 F.3d at 1067. The only potentially independent security he could obtain on the note would be personal guarantees from the Splagounias family. On balance, I

find the fact that Vardakostas obtained personal guarantees to have been a prudent act by someone familiar with the produce industry and the PACA, rather than an indication that Vardakostas knew Bostonia was then in financial straits.

For the foregoing reasons, I conclude that Bostonia has not been shown to have been in breach of the PACA trust in July 2011. This conclusion is fatal to plaintiffs' claim for disgorgement. *Boulder Fruit Exp. & Heger Organic Farm Sales* v. *Transp. Factoring, Inc.*, 251 F.3d 1268, 1272 (9th Cir. 2001) ("Whether a transferee of trust assets is a bona fide purchaser becomes relevant only as a defense after it has been determined that a breach of trust has occurred.").

Even assuming Bostonia was in breach as of July 2011, I find that Vardakostas neither knew nor should have known of such a breach. This would be a different case if Bostonia did not have a custom of delayed payment in which suppliers acquiesced; or if there were stronger evidence of Bostonia missing July 2011 payments for earlier invoices on its slow-pay schedule, or of July 2011 invoices going unpaid beyond the customary few months thereafter; or if Bostonia assets were more demonstrably meager in July 2011. But on the record before me those circumstances have not been demonstrated, and there are otherwise too few red flags for me to find Vardakostas should have known Bostonia was "financially

incapable of paying both suppliers and [himself]." *Consumers Produce*, 16 F.3d at 1384-85.

Thus, I find and conclude that Vardakostas was a bona fide purchaser and is shielded from disgorgement of the $120,000 paid to him by Bostonia in breach of the PACA trust, if there was a breach as of July 2011.

**B. Liability for $40,000**

Unlike the $120,000 payment in July 2011, the sale of three Bostonia trucks to Atlas more than a year later in October 2012 for $40,000 occurred at a time when no one disputes that Bostonia was in breach of the PACA trust. In theory, this act of liquidating trust assets should have been beneficial to PACA trust beneficiaries, if the trucks were sold at fair market value. In fact, plaintiffs do not contest the commercial reasonableness of the sale. Rather, they argue that the sale was designed to conceal the diversion of trust assets to Steven Splagounias. Bostonia's bank records show no deposit corresponding to the $40,000 paid for the trucks, indicating that Splagounias unlawfully deprived trust beneficiaries of these assets.

Vardakostas may be held liable if he knew Splagounias meant to divert the $40,000 paid for the trucks, or if Vardakostas otherwise participated in the transaction knowing that Splagounias was engaging in a breach of trust. *See* Restatement

(Second) of Trusts §§ 321, 326 (1959).[1]  I find the circumstances surrounding the sale of trucks sufficiently suspicious to support the inference that Vardakostas knowingly participated in diverting trust assets or knew Steven Splagounias meant to act in breach of trust.

Plaintiffs note that the truck sale occurred after defendants' counsel had been notified regarding plaintiffs' intention to litigate, and that the bill of sale fails to identify the buyer clearly.  These facts, according to Plaintiffs, suggest that Vardakostas was working to help his former business associate Steven Splagounias convert trust assets into cash and to divert those assets in advance of litigation,

---

[1] Contrary to Vardakostas's suggestion, plaintiffs properly brought these issues to my attention after the April 24 hearing. Plaintiffs had flagged the issue earlier in the litigation, and received approval from me to pursue the matter.  The delay in substantiating the claim is attributable to the fact that plaintiffs did not receive a response to their inquiries from the Massachusetts Registry of Motor Vehicles until after the scheduled evidentiary hearing. For his part, Vardakostas has had more than adequate time and opportunity to contest the issue, but he has chosen not to respond.  In a letter filed in tandem with his supplemental memorandum following the evidentiary hearing on disgorgement, Vardakostas sought to forestall judgment on the issue by requesting that he "be afforded . . . the opportunity to fully brief this . . . issue and/or have an evidentiary hearing as the [sic] pertains to recent sale of trucks."  Since then, Vardakostas has made no efforts to make any substantive submissions.  That was a dangerous gambit, since a passive-aggressive approach to addressing issues does not always end well for a party who chooses not to be proactive in advancing resolution of matters properly before the court.  Nevertheless, before finally resolving the truck sale issue, I will afford Vardakostas an opportunity to show cause why he should not make disgorgement of the sale price of the trucks.

all without attaching Vardakostas' name to the transaction.[2] I do not make such an inference from these facts alone. If anonymity was the goal in omitting Vardakostas' name from the bill of sale, one might have expected that he would have taken further steps to assure that his own name and the name of his new company were not found on the registration and title transfer documents for the trucks. But perfection is not always fully executed in deceptive schemes. The failure to include the printed name of a buyer on the bill of sale may reflect an informality in dealing, but it is also evidentiary of a fraudulent - if not entirely perfected – effort to conceal the identity of the buyer.

That said, the timing and peculiarities of the sale and accompanying documentation, considered in tandem with Vardakostas' concealment through dissembling testimony regarding the extent of his contacts with the Splagounias family after July 2010 lead me to find that Vardakostas participated in a breach of trust by purchasing the trucks from Steven Splagounias in October 2012. Vardakostas clumsily undertook to conceal the relationship with Splagounias in an effort to provide himself with plausible deniability for any allegation of meaningful knowledge of Bostonia's declining financial condition after 2010. I am

---

[2] In this connection, I note that Vardakostas, Steven Splagounias and the other personal guarantors on the note settled related state court litigation late last month. See *Vardakostas* v. *Bostonia Produce, Inc.*, SUCV2012-01761 (Mass. Super. Ct. Mar. 25, 2015) (judgment of dismissal).

satisfied that when considered in all its dimensions, the record before me establishes that Steven Splagounias and Vardakostas used the truck sale to liquidate and divert trust assets in advance of litigation. However, to afford Vardakostas the opportunity which he has conspicuously contrived not to pursue without specific direction from the court, see *supra* note 1, I will direct that he show cause, if any there by, why he should not be held liable for the $40,000 unlawfully withheld from the PACA trust beneficiaries based on his participation in that breach of trust through the truck sale. See Restatement (Second) of Trusts § 321 (1959).

### III. CONCLUSION

For the foregoing reasons, the issues originally raised by plaintiffs' motion for disgorgement, Dkt. No. 59, are hereby resolved in these findings and conclusion by an ORDER:

That Vardakostas not be required to disgorge the $120,000 payment he received from Bostonia in July 2011 as a bona fide purchaser for value, and it is FURTHER ORDERED:

That Vardakostas may, on or before April 24, 2015, show cause, if any there be, why he should not be held liable to the PACA judgment creditors for his participation in a breach of

trust in connection with the purchase of the Bostonia trucks through Atlas, and consequently disgorge the amount of $40,000, failing which an order of disgorgement in that amount will be entered.


                                    */s/ Douglas P. Woodlock*
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT